MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:  2017 ME 161
Docket:    Cum-16-528
Argued:    June 14, 2017
Decided:   July 20, 2017

Panel:     SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

BETH CARNICELLA

v.

MERCY HOSPITAL

MEAD, J.

[¶1]  Beth Carnicella appeals from a summary judgment entered by the Superior Court (Cumberland County, *Mills, J.*) in favor of Mercy Hospital on her complaint that Mercy discriminated against her in violation of the Maine Human Rights Act (MHRA).  *See* 5 M.R.S. §§ 4551-4634 (2016).  Carnicella argues that the court erred by determining that she was not a "qualified individual with a disability" as defined by the MHRA, and by failing to determine that Mercy did not meet its obligation to identify a reasonable accommodation for her disability.  We affirm the judgment.

## I. BACKGROUND

[¶2]  The following facts are presented in the light most favorable to Carnicella and are supported by the summary judgment record.  *See Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 2, 66 A.3d 7.

[¶3]  In 2011, Beth Carnicella was hired by Mercy Hospital as a part-time registered nurse (RN) at Mercy's Express Care facility in Gorham.  On July 29, 2013, Carnicella was diagnosed with a serious medical condition.  Carnicella requested a leave of absence to begin on August 9, 2013, to have surgery; she expected to be out of work for only two weeks.  In a letter dated August 1, 2013, Mercy granted her up to ten weeks of leave pursuant to Maine's Family Medical Leave statute.  *See* 26 M.R.S. § 844 (2016).  The letter also stated: "Once you are ready to return to work, have your Physician fax . . . a letter . . . stating the date you're cleared to return to work."

[¶4]  After her surgery, Carnicella developed complications that affected her ability to move her left arm properly.  On September 20, 2013, Mercy sent Carnicella a letter reminding her that her leave would expire on October 18, 2013, and that if she needed an extension, she must file a written request with the human resources department.  The letter also stated in bold print that she "must have clearance from [her] Physician before [she] return[s]

to work." At that time, Carnicella's medical provider had not released her to return to work.

[¶5] Carnicella requested an extension of her leave through November 18, 2013, which Mercy granted. In the October 10 letter granting the request, Mercy reiterated the need for Carnicella's physician to clear her to work prior to her return. Carnicella was unable to return to work on November 19 and requested a second extension of her leave. Mercy again extended Carnicella's leave and held her position open for her.

[¶6] Based on the information provided to Mercy by Carnicella's medical providers, Mercy expected her to return to work on or about December 31, 2013. Anticipating her return to work, Mercy sent Carnicella a memorandum dated December 13 regarding any reasonable accommodation she may need due to a disability. The memorandum explained, among other things, that it was "up [to her] to alert [her] supervisor or human resources to [her] need for accommodation." Carnicella returned the form having checked a box indicating that she "would like to go forward with the process of requesting a reasonable accommodation."

[¶7] On or around December 18, 2013, Mercy received a "Health Care Provider Questionnaire Regarding Employee Disability and Accommodation"

4

completed by Carnicella's surgeon. The form asked, among other things, whether there was a medical reason why Carnicella could not work her normal twenty-four-hour-per-week schedule, to which Carnicella's surgeon responded, "Yes. Cannot lift over 3 pounds or do repetitive computer, telephone work." Another question on the form asked: "Will Patient require any reasonable accommodations to enable him/her to perform the essential functions of his/her job (please consult enclosed job description). If so, what accommodations do you recommend?" In response, Carnicella's surgeon wrote: "Pending return to work – anticipated return to work 3/15/14."

[¶8] On January 21, 2014, Carnicella's primary care physician—who had taken over management of Carnicella's medical issues—wrote to Mercy regarding Carnicella's return to work. The physician explained:

> I know that [Carnicella's surgeon] recommended that [Carnicella] return to work on March 15, 2014[,] without restrictions. However, in the setting of her left arm weakness and the need for further evaluation, I do not believe that this is an appropriate return to work date. It is always difficult to estimate recovery time, particularly when an evaluation is ongoing. However, I would estimate that she will be able to work full time without restrictions by June 1, 2014.
>
> [Carnicella] loves her job and is highly motivated to return to work. She is understandably frustrated at the thought of having to postpone her return to work date. However, she cannot use her left arm and I have told her that she needs to recover sufficient strength in her arm to do her job safely. I am confident that we will be able

to help [Carnicella] achieve this and I would ask that you grant us a little more time . . . .

[¶9] On January 24, 2014, Carnicella met with the director of Mercy's human resources department and with Carnicella's direct supervisor. At that meeting, Carnicella did not represent that she had work capacity, either with or without reasonable accommodations. The HR director informed Carnicella that Mercy would extend her leave until March 15, 2014, and that if she were unable to return to work by that time, it would attempt to fill her position due to business needs, but Carnicella could then transition to working on a per diem basis. Both the HR director and Carnicella's supervisor assumed that if and when Carnicella returned to work, it would be with restrictions.

[¶10] In late February 2014, Carnicella's supervisor was preparing the schedule for April, May, and June; when she completed the schedule, she was unable to fill all of the shifts. Mercy contends that the supervisor sent Carnicella a text message and left her a voicemail asking whether she wanted to be on the schedule, and that Carnicella never responded. Carnicella, however, asserts that the supervisor contacted her only to see how she was doing and did not inquire about adding her to the schedule although Carnicella had been in regular contact with the supervisor.

6

[¶11] Around March 15, 2014, the HR director left Carnicella a voicemail asking for a status report concerning her work capacity. Carnicella returned the HR director's call and left a voicemail stating that she was not able to return to work. The HR director interpreted the voicemail to mean that Carnicella did not want to remain as a per diem employee, and so she processed Carnicella's termination from employment. The HR director sent Carnicella a letter dated March 20, 2014, explaining that her employment would end on March 21 and inviting her to "please reach out to explore job opportunities" when she was able to return to work.

[¶12] When Carnicella received the letter, she called her supervisor to discuss why she had been terminated instead of put on a per diem status. The supervisor then contacted the HR director and explained that Carnicella wished to remain on per diem status. Accordingly, on April 3, 2014, the HR director directed that Carnicella's termination be reversed and that she be reinstated as a per diem employee. Carnicella was restored to per diem status within a few days and remains a per diem employee to this day.[1] As of June 2016, however, no doctor had cleared Carnicella to actually return to work.

---

[1] Beginning in July 2014, the supervisor emailed Carnicella on several occasions inviting her and other per diem employees to pick up available shifts.

[¶13]  In April 2014, Carnicella applied for Social Security disability benefits, which she concedes was premised on her inability to work.  In a "Function Report" dated April 7, Carnicella described herself as unable to lift more than three pounds, having ongoing pain and weakness in her left arm and shoulder, and having minimal use of her left arm.  She stated on the form, "This disability has been life altering. . . . I was employed as an RN and was also an avid cook.  Now I cannot do either due to my strict functional limitations, pain, and neuropathies."  Carnicella filled out another Function Report in August 2014, where she represented that she experienced pain and immobility in her left arm and shoulder, and that she could not lift or make lateral or overhead movements with her left arm and shoulder.  Carnicella admits that the August 2014 report accurately reflected her restrictions and limitations at that time.

[¶14]  On September 2, 2015, Carnicella filed a complaint against Mercy alleging that Mercy discriminated against her in violation of the MHRA by terminating her employment because of her disability and refusing to provide her with a reasonable accommodation.  Mercy filed a motion for summary judgment on August 3, 2016.  On November 3, 2016, the court granted

Mercy's motion and entered summary judgment for Mercy. Carnicella appealed. *See* M.R. App. P. 2.

## II. DISCUSSION

[¶15] Carnicella argues that the court erred by granting summary judgment in favor of Mercy on her discrimination claim. We review de novo the grant of a summary judgment. *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 13, 45 A.3d 722. "Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 12, 86 A.3d 52 (quotation marks omitted); *see* M.R. Civ. P. 56(c).

[¶16] We ordinarily use a "three-step, burden-shifting analysis" in employment discrimination cases at the summary judgment stage. *Daniels*, 2012 ME 80, ¶ 14, 45 A.3d 722. Pursuant to that analysis, "an employee must first establish a prima facie case that (1) [s]he has a disability; (2) [s]he is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of [her] job; and (3) [her] employer adversely treated [her] based in whole or in part on [her] disability." *Id.* If the employee produces prima facie evidence of each element, the burden shifts to the employer to establish that it had a legitimate, nondiscriminatory basis for its actions; if the

employer does so, "the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action."[2]  *Trott*, 2013 ME 33, ¶ 15, 66 A.3d 7.

[¶17]  Here, there is no dispute that Carnicella is disabled, and Mercy concedes that it terminated Carnicella's employment because her disability prevented her from working.  The only issue pertains to the second element of Carnicella's prima facie case: whether Carnicella is "qualified, with or without reasonable accommodations, to perform the essential functions" of her job.

[¶18]  The MHRA provides that "[t]he opportunity for an individual to secure employment without discrimination because of . . . physical or mental disability . . . is recognized as and declared to be a civil right."  5 M.R.S. § 4571.  It further provides that "[a] covered entity may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to . . . [the] discharge of employees."  5 M.R.S. § 4572(2); *see also* 5 M.R.S. § 4553(1-B) (defining "covered entity").  An employer's failure to make

---

[2]  We have dispensed with the three-step, burden-shifting analysis as applied to summary judgment motions in claims of employment discrimination arising from alleged violations of Maine's Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840 (2016).  *See Brady v. Cumberland Cty.*, 2015 ME 143, 126 A.3d 1145.  In *Brady*, we held that once an employee presents a prima facie case of unlawful activity and thereby satisfies the first of the three steps, the employer is not entitled to summary judgment.  *Id.* ¶ 39.  Because in this case we conclude that Carnicella did not present a prima facie case of employment discrimination, we do not reach the question of whether our analysis in *Brady* would apply to disability-based claims of employment discrimination.

"reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" is also a form of discrimination. 5 M.R.S. § 4553(2)(E); *see Winslow v. Cty. of Aroostook*, No. 1:11-cv-162-GZS, 2013 U.S. Dist. LEXIS 20605, at \*32 (D. Me. Feb. 15, 2013).

[¶19] In the context of employment, a "'qualified individual with a disability' means an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 5 M.R.S. § 4553(8-D). The employee bears the burden of showing that he or she is a qualified individual with a disability and thus protected from employment discrimination by the MHRA. *See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 24 (1st Cir. 2002). "The examination of an employee's 'qualified' status requires consideration of available reasonable accommodations." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 33 (1st Cir. 2000). "The analysis is generally broken into two steps: (1) whether the employee could perform the essential functions of the job; [and] (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions." *Id.*

[¶20] Federal courts, interpreting provisions of the Americans with Disabilities Act (ADA) that closely track those of the MHRA,[3] have held that an employee cannot prove that she is a qualified individual with a disability when she has not established that she has been cleared to return to work by her medical provider. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("[B]ecause [the employee] was not released by her doctor to return to work, she has not met the . . . requirement that she be qualified to perform the essential functions of the job.").[4] Here, Carnicella has not

---

[3] "Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA." *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14 n.7, 824 A.2d 48 (alteration and quotation marks omitted).

[4] *See also Gamble v. JP Morgan Chase & Co.*, No. 16-6488, 2017 U.S. App. LEXIS 8376, at *12-13, 15 (6th Cir. May 9, 2017) (holding that an employee "was not a qualified individual for the purpose of the ADA" and was unable to establish the second prong of his prima facie discrimination case when he "was not released to work by his doctor and remained completely disabled at the time of his termination"); *Crews v. Dow Chem. Co.*, 287 F. App'x 410, 412 (5th Cir. 2008) ("[The employee] is not a 'qualified individual with a disability' under the ADA. According to her own physician, [she] cannot return to work in the foreseeable future. Thus, [she] cannot perform the essential functions of her job, with or without reasonable accommodation."); *Anderson v. Inland Paperboard & Packaging, Inc.*, 11 F. App'x 432, 438 (6th Cir. 2001) (holding that an employee could not establish the second prong of a prima facie case under the ADA when, at the time she was terminated, her doctor had not given her permission to return to work); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) ("[Plaintiff] remained unavailable for work until released by his physician . . . . Because [he] could not attend work, he is not a 'qualified individual with a disability' under the ADA."); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual protected by the ADA."); *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 594 (S.D. W. Va. 2008) ("It is well-settled that an individual who has not been released to work by his or her doctor is not a 'qualified individual with a disability.'"); *Crow v. McElroy Coal Co.*, 290 F. Supp. 2d 693, 696 (N.D. W. Va. 2003) ("Because [the employee] failed to obtain a release to work from his doctor, [he] has not shown that he can perform the essential functions of the job with or without reasonable accommodation.").

12

established that she was ever cleared to return to work by any medical provider. Since her initial leave of absence, Mercy made clear that Carnicella needed to have clearance from her physician in order to return to work. However, a report from her primary care physician dated January 24, 2014, indicated that Carnicella would not be able to return to work until possibly June. Moreover, Carnicella did not dispute her physician's assessment of her abilities or estimate of her return-to-work date and did not represent to Mercy that she had any work capacity at any time prior to her termination. *See Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014) ("By [plaintiff's] own admission, she couldn't work at any point or in any manner for a period spanning more than six months. It perhaps goes without saying that an employee who isn't capable of working for so long isn't an employee capable of performing a job's essential functions . . . ."). Because Carnicella did not have medical clearance to return to work, she was thus unable to perform the essential functions of her job at the time that she was terminated.[5]

---

[5] The record includes considerable detail and dispute regarding the "essential functions" of the RN position. Whether a task is an "essential function" of a job is ordinarily a question of fact for the fact-finder. *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 16, 45 A.3d 722; *Pinkham v. Rite Aid of Me., Inc.*, 2006 ME 9, ¶ 9, 889 A.2d 1009. However, because Carnicella was never cleared to return to work under any circumstances, the determination of the essential functions of the position is immaterial.

[¶21] Carnicella also has not proposed a reasonable accommodation that would have enabled her to perform the essential functions of her job in March when she received the termination letter, in April when she was restored to per diem status, or at any other time. Although Carnicella submitted a "checkbox" form to Mercy dated December 17, 2013, indicating only that she "would like to go forward with the process of requesting a reasonable accommodation," in a questionnaire dated December 18, Carnicella's surgeon did not specify any potential reasonable accommodations for Carnicella and noted that Carnicella's anticipated return to work would be March 15, 2014. About one month later, Carnicella's primary care physician indicated that she "estimate[d]" that Carnicella would be able to return to work "without restrictions" by June 1, 2014. Thereafter, on January 24, 2014, Carnicella, the HR director, and Carnicella's supervisor had a meeting at which Carnicella made no representation that she had the capacity to work.

[¶22] The only accommodation that Carnicella arguably requested was additional leave. However, this accommodation was unreasonable as a matter of law. As a statutory defense to liability for discrimination, the MHRA provides: "This subchapter does not prohibit an employer from discharging . . . an individual with physical or mental disability, or subject an employer to any

legal liability resulting from . . . the discharge of an individual with physical or mental disability, if the individual, because of the physical or mental disability, is unable to perform the duties . . . or is unable to be at, remain at or go to or from the place where the duties of employment are to be performed." 5 M.R.S. § 4573-A(1-B). At the time Carnicella was terminated, she was unable to perform the duties of a registered nurse at the Gorham Express Care facility; additional leave would necessarily continue to prevent Carnicella from performing those duties. Accordingly, because the statute provides a defense to discharging an employee who cannot perform her duties, it renders additional leave an unreasonable accommodation and permitted Mercy to terminate Carnicella without running afoul of the MHRA.

[¶23] Therefore, because Carnicella was unable to perform the essential functions of her job with or without a reasonable accommodation, there is no genuine issue of material fact that she is not a qualified individual with a disability, and the district court properly granted summary judgment on her disability discrimination claim.[6]

---

[6] Because Carnicella is not a qualified individual with a disability, she is also unable to establish a prima facie case of discrimination based on any failure of Mercy to accommodate her disability. *See Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007).

[¶24]  Furthermore, contrary to Carnicella's assertion, Mercy was under no obligation to propose, identify, or consult with Carnicella regarding reasonable accommodations.  Although the MHRA provides that damages may not be awarded if an employer "demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation," 5 M.R.S. § 4613(2)(B)(8)(b), this statute does not affirmatively and independently establish a duty on an employer to identify reasonable accommodations for a disabled employee.  As we have explained, "A plain language reading of [this] provision reveals that [it] provides an employer with an affirmative defense to a disability discrimination claim regarding a failure to accommodate pursuant to the MHRA"; it "does not require an employer to engage in such a consultation." *Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶ 27, 40 A.3d 955; *see Farnham v. Walmart Stores E., L.P.*, No. 1:13-cv-305-JDL, 2014 U.S. Dist. LEXIS 169202, at *16 (D. Me. Dec. 8, 2014).  Accordingly, in the absence of a statutory mandate to the contrary, we conclude that Mercy incurred no legal liability under the MHRA for failing to consult with Carnicella concerning reasonable accommodations for her disability.

The entry is:

Judgment affirmed.

---

Sarah A. Churchill, Esq. (orally), Nichols & Churchill, P.A., Portland, for appellant Beth Carnicella

Katherine I. Rand, Esq. (orally), Pierce Atwood LLP, Portland, for appellee Mercy Hospital

Cumberland County Superior Court docket number CV-2015-397
FOR CLERK REFERENCE ONLY